## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATE OF AMERICA**

        **Plaintiff,**               **Case No. 2:18-cr-20800**

**v.**                            **Hon. Stephen J. Murphy III**

**D-4.  DR. DAVID LEWIS, et al,**

        **Defendant.**

---

## DEFENDANT'S MOTION TO RECOVER ATTORNEY'S FEES AND OTHER LITIGATION EXPENSES

NOW COMES, Defendant, David Lewis, M.D. (Dr. Lewis), by and through undersigned counsel, Ronald W. Chapman II, and hereby files this motion requesting the Court order the United States to reimburse Dr. Lewis reasonable attorney's fees and his other litigation expenses under the Hyde Amendment.

                        Respectfully Submitted,
                        CHAPMAN LAW GROUP

Dated: August 18, 2022        /s/ *Ronald W. Chapman II*
                        Ronald W. Chapman II, Esq. LL.M.
                        MI Bar No. P73179
                        *Counsel for Defendant Lewis*
                        1441 W. Long Lake Rd., Ste. 310
                        Troy, MI  48098
                        T: (248) 644-6326/F: (248) 644-6324
                        RWChapman@ChapmanLawGroup.com

## BRIEF IN SUPPORT

### I.      Introduction

Dr. Lewis is a pain interventionalist licensed in the State of Michigan. ECF 1 at 1-6. He worked at The Pain Center USA, PLLC and Interventional Pain Center, PLLC, treating patients suffering from chronic pain. *Id.* The Government alleged that in or around January 2013 through November 2018 Dr. Lewis and his colleagues at both these Pain Centers conspired to commit health care fraud in violation of 18 U.S.C. § 1349 (Count 1) and conspired to unlawfully distribute controlled substances in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1) (Count 43). ECF 1. The Government also alleged that Dr. Lewis was guilty of the underlying substantive charges, claiming that he submitted fraudulent claims to the Medicare program in violation of 18 U.S.C. § 1349 (Count 30-31), and unlawfully distributed controlled substances in violation of 21 U.S.C. § 841(a)(1) (Count 53). ECF 1. As part of Counts 30-31 and 53, Dr. Lewis was also charged with aiding and abetting (18 U.S.C. § 2). *Id.*

The Government tried the case based on its overarching theme that Dr. Lewis and his colleagues were billing Medicare for injections for pain that were not medically necessary and tied these medically unnecessary injections to their prescribing of controlled substances thereby prescribing outside the usual course of professional practice, not for a legitimate medical purpose. ECF 1 at 19-20, 31; ECF

2

452 at 4 (arguing "[i]t was a one-size-fits-all medical practice. If a patient came to the Pain Center where the defendants worked, they received injections in their back, a back brace if their insurance would pay for it and a prescription for pain medication."). The Government tried to support its narrative by presenting the jury with Medicare claims and MAPS data, having an expert witness, Dr. Neel Mehta, testify on the treatment Dr. Lewis provided patients, and presenting testimony from Pain Center employees, as well as patients, who testified on the care Dr. Lewis provided to them. ECF 452, 415, 416.

At trial, on direct examination, the Government claimed its expert Dr. Mehta was testifying as to whether Dr. Lewis provided medically unnecessary and excessive treatments (i.e., health care fraud), and whether he prescribed controlled substances outside the course of professional practice (i.e., unlawfully distributed controlled substances). In his testimony, Dr. Mehta referenced his report he completed for trial and testified that the report was based on his review of one hundred (100) of Dr. Lewis' patients, including a thorough review of six (6) of these patients. ECF 415 at 116. Following the Government's questions, on cross-examination, Dr. Mehta testified that the report he created for trial – the one the Government based its indictment on– contained at least 13 to 14 erroneous observations and conclusions that he nor the Government noticed until a week before trial. ECF 415 at 68-72. On top of these errors, Dr. Mehta's report determined

whether Dr. Lewis violated § 841(a) (i.e., unlawfully prescribed controlled substances) by using a standard of care only appropriate for civil liability. Specifically, Dr. Mehta's testimony confirms that in his report, a doctor practices "outside the course of professional medical practice", and thus violates § 841(a), if a prescription was issued without any legitimate medical reason OR <u>would not have been issued by a doctor acting in accordance with the standards generally accepted in the United States</u>. *Id*. at 80-81; Expert Report at 2.

Following the Prosecution's case-in-chief, Dr. Lewis had two experts testify as part of his defense. First, he called Sean Weiss to testify on the coding and billing of claims to Medicare (i.e., local coverage determinations). He then called Ryan Vaughn to testify on the Medicare claims and MAPS data the Government presented at trial. As part of his testimony, Mr. Vaughn referenced graphs he created to aid the jury in understanding the voluminous data sets. These graphs confirmed that the Government's overarching theme in which it alleged Dr. Lewis and his colleagues were unnecessarily administering injections for pain and tying controlled substances to these injections was entirely unsubstantiated. (*See* Ex. A-H).

Unsurprisingly, at the close of trial, the jury acquitted Dr. Lewis on all counts charged in the indictment. ECF 456. Remarkably, not only was Dr. Lewis found not guilty, but the Prosecution failed to secure a guilty verdict against any of his colleagues, resulting in all fifty-six (56) Counts of the Prosecution's indictment

being dismissed. *Id*. However, Dr. Lewis' defense cost him a significant amount of money. He accrued $294,174.22 on legal fees, $50,632.42 on his experts' testimony (Sean Weiss and Ryan Vaughn) and the creation of the graphs he used at trial, as well as $22,661.46 for Dr. Murphy to review his patient files and testify at trial. *See* (Ex. I-K). These costs add up to a grand total of $367,468.10.

## II.    Relevant Law

Under 28 U.S.C. § 2412, commonly known as the Hyde Amendment, a prevailing party, other than the United States, may be provided reasonable attorney's fees and other litigation expenses where the United States brings forth vexatious or frivolous charges, or brings charges against a defendant in bad faith. *United States v. Heavrin*, 330 F.3d 723, 728 (6th Cir. 2003) (citing 28 U.S.C. § 2412). An award of attorney's fees is granted pursuant to the procedures and limitations but not the burden of proof provided in § 2412. *Id*.

In interpreting "vexatious" and "bad faith", the Sixth Circuit has adopted the Fourth and Eleventh Circuit's definitions. *Id*. Specifically, "vexatious" is defined as "without reasonable or probable cause or excuse", and "bad faith" is defined as "not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purposes or moral ambiguity;… it contemplates a state of mind affirmatively operating with furtive design or ill will." *Id*. (citing *United States v. True*, 250 F.3d 410, 423 (6th Cir. 2001)). The Sixth Circuit, on the other

hand, has adopted its own definition of "frivolous"[1] under the Hyde Amendment, which means "lacking a reasonable legal basis or where the government lacks a reasonable expectation of attaining sufficient material evidence by the time of trial.". *Id*. at 729. When assessing whether the United States brought charges that were either "vexatious" or "frivolous", or brought charges in "bad faith", a court must make one finding based on the "case as an inclusive whole" instead of performing a count-by-count analysis. *Id*. at 729-30 (holding "[e]ven if the district court determines that part of the government's case has merit, the movant might still be entitled to a Hyde Amendment award if the court finds that the government's 'position' as a whole was vexatious, frivolous, or in bad faith.").

Though the Hyde Amendment does not define the kind of party that may recover reasonable attorney's fees, the Amendment does instruct that it is subject to the procedures and limitations of the Equal Access to Justice Act (EAJA). *Id*. at 730. Under the EAJA, a party is eligible to recover reasonable attorney's fees only if they do not have a net worth that exceeds $2,000,000.00 at the time the government's action was filed. *Id*. at 731 (citing 28 U.S.C. § 2412(d)(1)(C)(2)(B)(i)). To substantiate his net worth, a defendant generally must provide an affidavit showing that the statutory criteria has been met. *Id*. at 732 (holding "[a] movant's bare

---

[1] *United States v. Knott*, 256 F.3d 20, 29-30 (1st Cir. 2001) (distinguishing the terms "vexatious" and "frivolous" in Hyde Amendment; for frivolousness, no improper motive need be shown);

assertion that his or her net worth falls short of two million dollars will generally be insufficient to satisfy this burden."); *but see D'Amico v. Indus. Union of Marine & Shipbuilding Workers of Am.*, 630 F. Supp. 919, 923 (D. Md. 1986) (noting that movants need not prove in an affidavit that they are "parties" under the EAJA "until some objection to their eligibility is raised by the government").

### III.    Argument

#### A. The Government's Charges Against Dr. Lewis were Frivolous

Dr. Lewis was charged with conspiring to commit health care fraud, as well as conspiring to unlawfully distribute controlled substances. To prove Dr. Lewis conspired to commit health care fraud, the Government had to show that: 1) Dr. Lewis and his colleagues, in some way or manner, came to a mutual understanding to try to commit health care fraud; and 2) that he knowingly and voluntarily joined in the conspiracy. *United States v. Williams*, 2015 U.S. Dist. LEXIS 127946, at *7 (E.D. Mich. 2015) (citing 18 U.S.C. § 1349). To prove Dr. Lewis conspired to unlawfully distribute controlled substances, the Government had to show that: (1) Dr. Lewis and his colleagues, in some way or manner, came to a mutual understanding to try to violate drug laws, (2) had knowledge and intent to join the conspiracy, and (3) participated in the conspiracy. *United States v. Watson*, 620 Fed. Appx. 493, 504 (6th Cir. 2015) (citing 21 U.S.C. § 846).

As for the substantive counts, to prove Dr. Lewis committed health care fraud, the Government had to show that (1) he knowingly devised a scheme or artifice to defraud Medicare in connection with the delivery of or payment for Medicare benefits, items, or services, (2) that he executed or attempted to execute this scheme or artifice to defraud, and (3) he acted with intent to defraud. *United States v. White*, 492 F.3d 380, 394 (6th Cir. 2007) (citing 18 U.S.C. § 1347). To prove the unlawful distribution of controlled substances, the Government had to show that Dr. Lewis, 1) knowingly or intentionally, 2) distributed a controlled substance, and 3) not for a legitimate medical purpose outside the course of professional practice. *United States v. Chaney*, 921 F.3d 572, 589 (6th Cir. 2019) (citing 21 U.S.C. § 841(a)).

When assessing Dr. Lewis's case "as an inclusive whole", it is clear that the charges the Government brought against him were "frivolous". In other words, the Government lacked a reasonable legal basis to bring these charges and lacked a reasonable expectation of attaining sufficient material evidence by the time of trial to prove the charged conduct. *See Heavrin*, 330 F.3d at 729. Therefore, as discussed in greater detail below, Dr. Lewis should be awarded reasonable attorney's fees, as well as the costs involved in his defense.

      *i.*    *The Medicare Claims and MAPS Data*

Recall, the Government's case was built on its overarching theme that Dr. Lewis and his colleagues were inappropriately billing Medicare for injections that

were not medically necessary and tying these injections to the prescribing of controlled substances thereby prescribing outside the usual course of professional practice. ECF 1 at 19-20, 31; ECF 452 at 4 (arguing "[i]t was a one-size-fits-all medical practice. If a patient came to the Pain Center where the defendants worked, they received injections in their back, a back brace if their insurance would pay for it and a prescription for pain medication."). However, the Medicare claims and MAPS data the Government presented at trial completely undermine the Government's narrative.

Between November 1, 2016, to July 23, 2018, the time period alleged in the indictment, Dr. Lewis billed Medicare for $7,873,881.00, of which he was paid $687,647.00. (Ex. A); (Ex. B). This means that he averaged roughly $35,000.00 per month. *Id*. This amount is before overhead, expenses, and taxes. Further, unlike the Government claimed, patients were not continuing to return to Dr. Lewis' practice. ECF 1 at 19 (alleging "prescribing prescription opioids and other controlled substances to induce patients to attend reoccurring office visits…"). The Medicare claims data shows that Dr. Lewis' patients were recovering from their pain and that well over half (i.e., 58%) of his patients receiving facet injections only received these injections at two (2) or fewer office visits. (Ex. C). In fact, across all patients receiving facet injections, the claims data supports that, over time, Dr. Lewis' patients were receiving fewer injections, and that by ninety (90) days after a patient's

initial visit, all patients stopped receiving facet injections altogether. (Ex. D). This was not only the case for facet injections, but rather a reoccurring trend for all Dr. Lewis' patients receiving any type of injections. (Ex. E). Unlike the Government claimed, the Medicare claims and MAPS data support that Dr. Lewis was not tying controlled substances to injections. Indeed, across all the Medicare patients Dr. Lewis treated, he saw these patients for an average of one hundred nine (109) days, and he roughly saw ten (10) Medicare patients per day. (Ex. F; Ex. G).

Evidently, on their face, the Medicare claims and MAPS data reveal that there was not a reasonable legal basis for the Government to charge Dr. Lewis with the charges listed in its indictment. All the Government had to do was review its data prior to trial and this would have been evident. It was abundantly clear at trial that neither Agent Tolan (HHS), nor any of the fraud auditors from the Attorney General's office, UPIC, or insurance companies were asked to actually look into the data. Indeed, like in *United States v. Braunstein*, where the Court awarded attorney's fees because the government was found to be in possession of evidence that made its charges "so obviously wrong as to be frivolous", here too, the Government was also in possession of this kind of evidence (i.e., Medicare claims and MAPS data). 281 F.3d 982, 996-97 (9th Cir. 2002). In fact, Unified Program Integrity Contractor (UPIC) auditors are required to provide training to law enforcement on how to audit Medicare claims, and further, are required to audit a Medicare provider's claims

where fraud is believed to have occurred.[2] Beyond this required auditing, Chapter

Eight of the Medicare Program Integrity Manual also instructs that fraud cannot be

determined without pulling a statistically random valid sample of claims. *See* CMS,

*Medicare Program Integrity Manual*.[3] The Manual also specifies that there must be

a sustained error rate of greater or equal to fifty percent (50%) and there must be

documentation showing education has previously failed at resolving errors in claim

submission. *Id.*

Here though, rather than following these requirements to protect against

waste, the Government, prior to its search warrant, only reviewed videos on the

treatment of three (3) of Dr. Lewis' patients (i.e., AP, HB, ND). This means the

Government reviewed 0.002% of the 1,407 patients Dr. Lewis treated, which falls

shy of the fifty (50) percent sustained error rate for a finding of fraud under the

Medicare Program Integrity Manual. The insurance representatives the Government

called at trial also failed to meaningfully review the Medicare claims data to

determine if there was fraud.[4]

---

[2] CMS, *Review Contractor Directory – Interactive Map* (Dec. 01, 2021, at 8:00 PM),
https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/Review-Contractor-Directory-Interactive-Map (confirming "[t]he Unified Program Integrity Contractors (UPICs) perform fraud, waste, and abuse detection, deterrence and prevention activities for Medicare and Medicaid claims processed in the United States. Specifically, the UPICs perform integrity-related activities associated with Medicare Parts A, B, Durable Medical Equipment (DME), Home Health and Hospice (HH+H), Medicaid, and the Medicare-Medicaid data match program (Medi-Medi). The UPIC contracts operate in five (5) separate geographical jurisdictions in the United States and combine and integrate functions previously performed by the Zone Program Integrity Contractor (ZPIC), Program Safeguard Contractor (PSC), and Medicaid Integrity Contractor (MIC) contracts.").
[3] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c08.pdf
[4] These insurance representatives include: Mary Sue Garner (WPS), Wachtman (Coventbridge), Kartina Guy (Attorney General's Fraud analyst), and the BCBS Fraud Investigator.

The Government though was not satisfied simply ending its investigation after issuing its search warrant, instead, determined to further the waste UPIC auditors are used to protect against, the Government took this case to trial where litigation ensued for nearly one (1) month. From the start, this trial had as much of a chance at success as the percentage of Dr. Lewis' patients (i.e., 0.002%) the Government reviewed and focused its case on. A percentage that may even be a bit too generous seeing as though no one else shared the Government's view of fraud or improper prescribing.[5]

Accordingly, the charges against Dr. Lewis were "frivolous" because the Government lacked a reasonable legal basis for the charges and did not have a reasonable expectation of attaining sufficient material evidence by the time of trial. Dr. Lewis should therefore be awarded his attorney's fees and his costs for defending himself at trial.

## ii.  *The Government's Expert Report from Neel Mehta*

The Government also tried to support its overarching narrative with testimony from its expert witness Dr. Neel Mehta. Dr. Mehta's testimony was based on his expert report which contained his opinions on six (6) of Dr. Lewis' patients to determine whether Dr. Lewis was administering medically unnecessary injections for pain in violation of 18 U.S.C. § 1347, as well as whether he was unlawfully

---

[5] None of the joint commission, the Warren and Eastpointe Police Departments, the community, the medical community (i.e., doctors), the Michigan Board of Medicine, and the Drug Enforcement Administration.

prescribing controlled substances in violation of 21 U.S.C. § 841(a). *See* Expert Report. However, at trial, Dr. Mehta only provided his opinion on Dr. Lewis' treatment of two (2) patients, and it was further revealed that his report – a report the Government based its charges on – was inaccurate and fraught with error. Specifically, Dr. Mehta testified his report contained at least 13 to 14 errors that he had not noticed until a week before trial. ECF 415 at 68-73. In fact, Dr. Mehta testified he copied and pasted entries in his report related to one patient to other portions of his report related to another patient. *Id.* at 71. Perhaps, this is why the Government, in failing to effectively review the Medicare claims and MAPS data, argued that Dr. Lewis' practice "…was a one-size-fits-all medical practice. If a patient came to the Pain Center where the defendants worked, they received injections in their back, a back brace if their insurance would pay for it and a prescription for pain medication." ECF 452, 415, 416. The Government could not have possibly determined that the practice was a "one size fits all" practice after reviewing (3) patients prior to charging Dr. Lewis and (6) patients prior to trial. The government's position was not in good faith.

Even more concerning, in the second page of Dr. Mehta's report, he explains that he used a civil standard of care when assessing whether Dr. Lewis prescribed controlled substances outside the course of professional practice in violation of § 841(a). *See* Expert Report at 2. The expert report claims that a doctor practices

13

"outside the course of professional medical practice", and thus violates § 841(a), if a prescription "was issued without any legitimate medical reason OR <u>would not have been issued by a doctor acting in accordance with the standards generally accepted in the United States</u>." *Id*. This latter standard is not found anywhere in the Controlled Substances Act (CSA) and is only appropriate for establishing liability in civil cases. *See United States v. Oppong*, 2022 U.S. App. LEXIS 9475, at *15 (6th Cir. 2022) (citing *United States v. Smith*, 573 F.3d 639, 649 (8th Cir. 2009) ("rejecting the argument that the definition of 'usual course of professional practice' conflated the standard for criminal liability with the standard for medical malpractice in part because '**the jury instructions on the whole required more than a finding that [the physician] did not adhere to generally accepted medical standards**'"…)); *United States v. Feingold*, 454 F.3d 1001 (9th Cir. 2006) (acknowledging "…a violation of the standard of care **alone is insufficient** to support the criminal conviction of a licensed practitioner under § 841(a). But we do not agree that standard of care is irrelevant or prejudicial.").

Remarkably, Dr. Mehta testified that the Government reviewed his expert report at least five times prior to trial. ECF 415 at 67. Even more alarming, Dr. Mehta testified that the modifications the Government suggested and/or made to his report were only related to legal portions. *Id*. ("Q: And it's your testimony that those modifications were only related to legal portions of the report? A: Correct."). Dr.

Mehta's testimony makes clear that the Government was fully aware of this incorrect legal standard in his report (i.e., that practicing outside the standards generally accepted in the United States alone is sufficient to violate § 841(a)), and despite seeing it at least five (5) times prior to trial, never corrected it. *Id.*

Despite all these issues with Dr. Mehta's report, his biggest error was that the opinions and conclusions he drew on Dr. Lewis' treatment of Andrew Peterson, the undercover agent who posed as a patient of Dr. Lewis', assumed it was Mr. Peterson's first visit at the Pain Clinic. However, at trial, it was revealed that Mr. Peterson was an existing patient and that other providers at the Pain Clinic had previously treated him. Volume 6 at 72-73. Somehow, the Government, and its expert, failed to review the treatment by prior unindicted providers that established a legitimate medical basis for the prescriptions. Because he failed to look at the complete patient chart and prior history, Dr. Mehta's assessment of Dr. Lewis' treatment had no probative value for determining whether Dr. Lewis was prescribing controlled substances in violation of § 841(a).[6]

The impact of all these errors was on full display at trial. On cross-examination, Dr. Mehta testified that Mr. Peterson testing negative for opioids after Dr. Lewis had prescribed him these drugs was a "red flag", making Dr. Lewis'

---

[6] Another, more insidious conclusion that can be drawn is that the Government purposefully concealed this fact from Dr. Mehta by not giving him the undercover videos and medical records that show he was previously treated at the Pain Clinic.

continued prescribing of the same to Mr. Anderson "outside the course of professional practice". ECF 415 at 82-89. At the same time, Dr. Mehta testified he observed Dr. Lewis had a conversation with Mr. Anderson, as he was required to do, and that Mr. Anderson told Dr. Lewis that his urine test was negative because he was unable to fill his prescription prior to his appointment. *Id*. at 89. This led Dr. Mehta to testify that it would have also been a "red flag" had Mr. Anderson tested positive for opioids. ("Q: So red flag if he tests positive and a red flag if he tests negative? A: To be able to interpret in the context, yes.").[7] No matter what Dr. Lewis did, or could have done, he was in the "red" according to Dr. Mehta.[8]

Clearly, this expert report the Government paid $25,000.00 for using taxpayers' money was nowhere near enough to form a reasonable legal basis to charge Dr. Lewis with the charges listed in the Government's indictment. ECF 415 at 72 (asking "Q: How do you feel about charging the government $25,000.00 for a document that at least contains 14 mistakes? A: I feel terrible."). Further, the Government was fully aware of this because it reviewed Dr. Mehta's expert report at least five (5) times before trial. *Id*. at 67. Exactly like the Medicare claims and

---

[7] Dr. Mehta's testimony also indicates that he believed Mr. Anderson's explanation for why his urine test came back negative was reasonable and that he encounters such instances in his own practice. ECF 415 at 89. Yet, Dr. Mehta still claimed this was concerning and a reason why he thought Dr. Lewis was practicing "outside the course of professional practice". *Id*. at 83 ("Q: All right. Now, during your direct exam there were three reasons you indicated that the prescription was outside the course of professional practice… Q: All right. And then you also believed that his urine drug screen was negative? A: Correct.").

[8] *See* Ex. L. confirming Dr. Lewis' treatment of Mr. Anderson was appropriate and that he was not prescribing outside the course of his professional practice.

16

MAPS data, the Government was in possession of Dr. Mehta's expert report prior to trial, and as in *Braunstein,* the expert report made the Government's charges of Dr. Lewis "so obviously wrong as to be frivolous". 281 F.3d at 996-97.

Accordingly, the charges against Dr. Lewis were "frivolous" because the Government lacked a reasonable legal basis for the charges and did not have a reasonable expectation of attaining sufficient material evidence by the time of trial. Dr. Lewis should therefore be awarded his attorney's fees and his costs for defending himself at trial.

> iii. *The Government's Confidential Informant Henderson Butler*

The Government also used a confidential informant, Henderson Butler, to try to support its overarching narrative at trial. Mr. Butler has a long history of abusing crack cocaine and admitted to purchasing cocaine from a dealer on the street while serving as a confidential informant for the Government. ECF 416 at 21-23. Mr. Butler also admitted the Government tested his urine regularly and was aware that he was abusing crack cocaine over the course of its investigation. *Id*. The Government didn't seem to care and continued to use Mr. Butler as a confidential informant in this case. *Id*. While this in and of itself may not be a problem, the Government's lack of oversight of Mr. Butler, while fully aware he was abusing crack cocaine, was a serious problem that significantly undermined the Government's case.

To be sure, at trial, Mr. Butler testified that he informed Dr. Lewis of fictitious symptoms which exceeded those that the Government instructed him to fabricate. ECF 416 29-34. Yet, even though Mr. Butler continued to do this, the Government kept him as a confidential informant, trying to build their case based on the excessive/additional symptoms he reported to Dr. Lewis. ECF 416 at 30-32. These excessive/additional symptoms exceeded the scope of the Government's investigation thereby significantly undermining its claims that Dr. Lewis prescribed controlled substances outside the scope of professional practice. For instance, Mr. Butler was instructed to report that he suffered from moderate pain (i.e., less than 5 out of 10), however, over a period of many years, he consistently complained of level 5-6 pain, and sometimes even level 8 pain. Volume 6 at 30-34. As one of the Government's agents, Ms. Link, made clear, by Mr. Butler complaining of level 5 pain and greater over a sustained period of time, he gave Dr. Lewis a legitimate basis for prescribing controlled substances.

Another issue with the Government relying on Mr. Butler to build its case is that his treatment at the Pain Clinic completely undermines the Government's overarching narrative of events. First, across all Mr. Butler's thirteen (13) visits to the Pain Center, he never once received an injection for his pain thereby undermining the Government's allegations that Dr. Lewis was tying controlled substances to injections. (Ex. M). Second, even though Mr. Butler was not receiving any

injections, Dr. Lewis and his colleagues continued to prescribe him the same quantity of controlled substances, further undermining this tying argument. *Id*. Third, the only time when Mr. Butler's quantity of controlled substances was lowered was on his last visit to Dr. Patel, where he indicated his pain had improved and was only a level 2 (instead of the level 5-6 and 8 he previously reported).[9] Certainly, this undermines the Government's case and proves that Dr. Lewis was thoughtfully prescribing controlled substances that were tailored and responsive to his patient's symptoms. And further, none of the physicians Mr. Butler saw at the Pain Center lowered/modified his quantity of controlled substances even after he refused injections, thereby disproving the Government's allegations that Dr. Lewis and his colleagues were collectively conspiring to tie injections to controlled substances. (Ex. N).

Accordingly, the Government's mismanagement of Mr. Butler is yet another error in its investigation further supporting that the charges against Dr. Lewis were "frivolous" because the Government lacked a reasonable legal basis for the charges and did not have a reasonable expectation of attaining sufficient material evidence by the time of trial. Dr. Lewis should therefore be awarded his attorney's fees and his costs for defending himself at trial.

---

[9] This sudden improvement in Dr. Patel's pain is unsurprising because it was the only way that he could get the physicians at Pain Center to lower his quantity of controlled substances to try to corroborate the Government's narrative that Dr. Lewis and his colleagues were tying controlled substances to injections (i.e., because Mr. Butler was refusing injections Dr. Lewis and his colleagues were cutting him off of controlled substances).

iv.    The Jury's Acquittal Dr. Lewis and His Colleagues on
       Fifty-Six Counts

Though the acquittal, without more, is not enough for the recovery of attorney's fees under the Hyde Amendment, in this case, it was not only Dr. Lewis that was acquitted by the jury. *See United States v. True*, 250 F.3d 410, 424 (6th Cir. 2001) (holding acquittal alone is not the standard for an award under the Hyde Amendment); *United States v. Barone*, 5111 Fed. Appx. 15, 16 (2d Cir. 2013) (holding an acquittal, without more will not lead to recovery under the Hyde Amendment); *United States v. Gilbert*, 198 F.3d 1293, 1303 (11th Cir. 1999) (holding Hyde Amendment requires more than an acquittal). As discussed, the jury acquitted Dr. Lewis and all his colleagues across all fifty-six (56) Counts the Government charged in its indictment. ECF 456. This was unsurprising though given the fatal flaws in the Government's evidence previously discussed, and because the Government did not provide a single piece of evidence at trial to prove that Dr. Lewis and his colleagues had an agreement and participated in a conspiracy.

Dr. Lewis was simply a pain interventionalist who took his responsibility to treat patients seriously and his commitment and dedication to his patients did not go unnoticed. (*See* Ex. O). After assessing Dr. Lewis' case "as an inclusive whole", the jury's decision across all fifty-six (56) Counts confirms what was discussed throughout this motion, that the Government's evidence, which it was in possession of prior to trial, was entirely insufficient to sustain even one conviction at trial. In

other words, the Government was in possession of evidence that made its charges "so obviously wrong as to be frivolous". *See Braunstein,* 281 F.3d at 996-97.

Accordingly, the charges against Dr. Lewis were "frivolous" because the Government lacked a reasonable legal basis for the charges and did not have a reasonable expectation of attaining sufficient material evidence by the time of trial. Dr. Lewis should therefore be awarded his attorney's fees and his costs for defending himself at trial.

### B. Dr. Lewis' Net Worth Does Not Exceed the Statutory Criteria Under the EAJA

To recover his attorney's fees and the cost involved in his defense, Dr. Lewis must qualify as a "party" under the EAJA, which includes those whose net worth does not exceed $2,000,000.00 at the time of trial. 28 U.S.C. § 2412(d)(2)(B). This Court considers an affidavit from the party moving for attorney's fees sufficient to constitute *prima facie* proof of a movant's net worth. *Heavrin*, 330 F.3d at 732 (finding "[t]his, in our opinion, is sufficient to constitute *prima facie* proof of Heavrin's status as a 'party.'").

Dr. Lewis has attached an affidavit detailing his net worth at the time of trial, which did not exceed the $2,000,000.00 threshold under the EAJA. (Ex. P). Therefore, Dr. Lewis meets the statutory criteria and should be permitted to recover his attorney's fees and costs involved in his defense from the Government.

## IV.   Conclusion

For the foregoing reasons, Dr. Lewis should be awarded his reasonable attorney's fees and the cost involved in his defense, and the Government should reimburse him $367,468.10.

Respectfully Submitted,
CHAPMAN LAW GROUP

Dated: August 18, 2022            /s/ *Ronald W. Chapman II*
                                  Ronald W. Chapman II, Esq. LL.M.
                                  MI Bar No. P73179
                                  *Counsel for Defendant Lewis*
                                  1441 W. Long Lake Rd., Ste. 310
                                  Troy, MI  48098
                                  T: (248) 644-6326
                                  F: (248) 644-6324
                                  RWChapman@ChapmanLawGroup.com

## **<u>PROOF OF SERVICE</u>**

I hereby certify that on August 18, 2022, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to any involved non-participants.

/s/ *Ronald W. Chapman II, L.L.M.*
Ronald W. Chapman II, Esq. L.L.M.
MI Bar No. P73179
*Counsel for Defendant Lewis*
RWChapman@ChapmanLawGroup.com